IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| WASHINGTON PROPERTIES, INC., *et al.*[1] | ) | CASE NO. 16-50833 |
| | ) | (Request for Joint |
| | ) | Administration Pending) |
| | ) | |
| | ) | JUDGE KOSCHIK |
| | ) | |
| DEBTORS | ) | |

**AFFIDAVIT AND STATEMENT OF MICHAEL R. ROSE IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Michael R. Rose, hereby declare as follows:

1.        I am the President and Chief Executive Officer of Washington Properties, Inc. ("WPI"), an Ohio corporation with its primary business operations being located at 23 Public Square, Suite 200, Medina, OH 44256.  I am also the managing member of Western Reserve of Medina, Ltd. ("Western Reserve"), and the managing member of MRR Properties, LLC ("MRR" and collectively with WPI and Western Reserve, the "Debtors").  In this capacity, I am familiar with the Debtors' day-to-day management and financial affairs.

2.        On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 (collectively, the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors and the last four digits of the Debtors' United States Tax Identification Number following in parentheses are: Washington Properties, Inc. (1231); Western Reserve of Medina, Ltd. (4201); and MRR Properties, LLC (3179).

3.     Except as otherwise indicated, all statements set forth in this Affidavit are based upon: (a) my personal knowledge as Chief Executive Officer or managing member; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; and/or (d) my experience and knowledge of the Debtors' business operations and financial affairs. I have acted as Chief Executive Officer and managing member for over thirty years.

4.     To enable the Debtors to minimize the adverse effects of the Chapter 11 Cases, the Debtors have requested various types of relief in various "first-day" applications and motions (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief aimed at, among other things, retaining employees, promoting an efficient and economical restructuring, and maintaining the Debtors' going-concern value as they attempt to reorganize and/or efficiently liquidate the assets of the Debtors. I believe the relief sought in the First Day Pleadings is crucial to achieving these goals.

5.     I submit this Affidavit in support of the First Day Pleadings. Any capitalized term not expressly defined herein has the meaning ascribed to that term in the relevant First Day Pleading. All facts set forth in this Affidavit are based on my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition

6.     If called to testify, I could and would testify to the facts set forth in this Affidavit.  I am authorized by the Debtors to submit this Affidavit.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operations of, the Debtors' businesses, and (b) maximize and preserve the value of the Debtors'

2

bankruptcy estates. Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.

7.      Part I of this Affidavit describes the Debtors' business. Part II describes the circumstances surrounding the commencement of the Chapter 11 Cases. Part III describes the relief the Debtors intend to seek during the Chapter 11 Cases. Part IV sets forth the relevant facts in support of each of the First Day Pleadings.

## Part I: Debtors' History & Business

8.      WPI is a corporation formed under the laws of the State of Ohio, with its primary business operations being located at 23 Public Square, Suite 200, Medina, OH 44256. WPI was originally formed in the 1980's to manage commercial real estate. Since the mid-2000's, WPI has had two (2) shareholders: Michael R. Rose ("M. Rose") (90% shareholder), and Brendan Rose ("B. Rose") (10% shareholder). M. Rose is the acting CEO and President of WPI, and a Director. B. Rose is the acting Treasurer of WPI and a Director. WPI currently employs approximately seven hourly and/or salaried employees.

9.      As of the Petition Date, WPI manages in excess of thirty commercial properties which primarily consist of office buildings and light industrial buildings. All of the properties managed by WPI are located in the Ohio counties of Medina and Wayne. Of the properties managed by WPI, one of the properties is owned by Western Reserve, and thirteen of the properties are owned by MRR.

10.     Debtor Western Reserve is a limited liability company formed under the laws of the State of Ohio, with its primary business operations being located at 23 Public Square, Suite 200, Medina, OH 44256. Western Reserve was formed in the year 2000 for the purpose of developing commercial office space located at 3985-4015 Medina Road,

3

Medina, Ohio. The commercial property known as Western Reserve was completed around 2006. All of Western Reserve's revenues are generated from this single commercial property. Western Reserve has five members (membership interest in parentheses): M. Rose (58.89%), Ralph M. Laporte, Jr. (16.67%), Alex C. Bonvechio (15.56%), Laporta Family Ltd Partnership II (5.56%), and Roger T. Duffy (3.33%). Western Reserve does not have any employees. As such, the property is managed by WPI.

11.     MRR is a limited liability company formed under the laws of the State of Ohio, with its primary business operations being located at 23 Public Square, Suite 200, Medina, OH 44256. MRR was formed in the year 2006 for the purpose holding title to real estate. MRR owns thirteen (13) properties in the Ohio counties of Wayne and Medina. MRR has two members (membership interest in parentheses): M. Rose (90%) and B. Rose (10%). MRR does not have any employees. As such, all of the properties are managed by WPI.

**Owned and Leased Real Property**

12.     WPI does not own any real property. WPI leases its current office location at 23 Public Square, Suite 200, Medina, Ohio from MRR. WPI also subleases office space located at 144-156 E. Liberty Street in Wooster, Ohio.

13.     Western Reserve is the title owner to the following real property:

    (a)    3985, 3995, 4015 Medina Road, Medina, Ohio, parcel no. 026-06D-31-071, acquiring title to the property on or about May 15, 2007.

14.     MRR is the title owner to the following real property:

    (a)    13 South Court St., Medina, Ohio ("Clock" or "13 Public Square"),

4

parcel nos. 028-19A-21-216, acquiring title to the property on or about December 13, 2006;

(b)    18 Public Square, Medina, Ohio ("Highs" or "18 Public Square"), parcel nos. 028-19A-21-348, 028-19A-21-355, 028-19A-21-357, acquiring title to the property on or about December 20, 2006;

(c)    21-23 South Court St., Medina, Ohio ("Towne" or "23 Public Square"), parcel nos. 028-19A-21-212, 028-19A-21-352, acquiring title to the property on or about February 6, 2007;

(d)    28 South Court St., Medina, Ohio ("Rapp"), parcel no. 028-19A-21-368, acquiring title to the property on or about December 20, 2006;

(e)    44-47 Public Square, Medina, Ohio ("Arcade"), parcel nos. 028-19B-20-113, 028-19B-20-114, 028-19B-20-115, acquiring title to the property on or about December 20, 2006;

(f)    241 South Court St., Medina, Ohio ("241 Building"), parcel no. 028-19A-21-334, acquiring title to the property on or about June 30, 2014;

(g)    277-281 South Court St., Medina, Ohio ("Neumeyer"), parcel nos. 028-19A-21-242, 028-19A-21-243, acquiring title to the property on or about December 13, 2006;

(h)    307-323 South Court St., Medina, Ohio ("Granary Row"), parcel no. 028-19C-05-362, acquiring title to the property on or about December 13, 2006;

(i)    431-457 W. Liberty Street, Medina, Ohio ("Liberty Row"), parcel

5

no. 028-19A-21-359, acquiring title to the property on or about December 13, 2006;

(j)    740-750 East Washington St., Medina, Ohio, ("Washington Square"), parcel no. 028-19B-22-162, acquiring title to the property on or about December 13, 2006;

(k)    801-807 East Washington St., Medina, Ohio ("Washington Park"), parcel no. 028-19B-22-163, acquiring title to the property on or about December 13, 2006;

(l)    142 E. Liberty St., Wooster, Ohio ("142 Building"), parcel no. 64-00178, acquiring title to the property on or about December 27, 2006;

(m)  149 E. Liberty St., Wooster, Ohio ("Newberry"), parcel no. 64-02205, acquiring title to the property on or about December 27, 2006;

**Lender Summary**

15.    The Debtors do not have a revolving line of credit to support their business operations. Instead, Debtors are reliant upon rental income received from the use of the real estate listed above to fund their liquidity needs.

16.    The Debtors are parties to the following mortgage loans[2]:

(a)    FirstMerit Bank National Association ("FirstMerit")

(i)    On October 18, 2005, Western Reserve executed and delivered a promissory note in the principal amount of $9,280,000.00, loan number

---

[2] Debtors have granted a security interest to M. Rose and his spouse, Traci Rose, for certain note payables arising from personal loans made to the Debtors. These mortgage interests are subject to subordination agreements and have been excluded from the present lender summary.

6

ending in x5110 in favor of FirstMerit. The promissory note was subsequently amended on March 15, 2014, and bifurcated the note into two portions: (a) an A Portion in the principal amount of $4,825,000, and (b) a B Portion in the principal amount of $2,751,008.94. The bifurcated notes were further amended on November 8, 2015 (the original note, collectively with the amendments, referred to herein as the "FM Western Reserve Note"). M. Rose, WPI and MRR have each guaranteed the indebtedness due FirstMerit under the FM Western Reserve Note. FirstMerit was granted a mortgage and an assignment of rents to secure FM Western Reserve Note in the property commonly known as 3985, 3995, and 4015 Medina Road, Medina, Ohio, 44256.

(ii)     On October 20, 2005, M. Rose executed and delivered a promissory note in the principal amount of $140,000.00, loan number ending in x5118 in favor of FirstMerit. The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, the "FM MRR Note One"). FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note One in the property commonly known as 13 Public Square, Medina, Ohio, 44256.

(iii)     On October 20, 2005, M. Rose executed and delivered a promissory note in the principal amount of $1,160,000.00, loan number ending in x5119 in favor of FirstMerit. The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, referred to herein as the "FM MRR Note Two"). FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note Two in the property commonly known as 307 - 325 South Court Street, Medina, Ohio, 44256.

16-50883-amk    Doc 4    FILED 04/18/16    ENTERED 04/18/16 19:48:41    Page 7 of 30

(iv)     On October 20, 2005, M. Rose executed and delivered a promissory note in the principal amount of $124,000.00, loan number ending in x5120 in favor of FirstMerit.  The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, referred to herein as the "FM MRR Note Three"). FirstMerit was granted a mortgage an assignment of rents to secure FM MRR Note Three in the property commonly known as 140 South Main Street, Wooster, Ohio 44691.

(v)     On October 20, 2005, M. Rose executed and delivered a promissory note in the principal amount of $360,000.00, loan number ending in x5121 in favor of FirstMerit.  The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, referred to herein as the "FM MRR Note Four"). FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note Four in the property commonly known as 142 East Liberty Street, Wooster, Ohio 44691.

(vi)     On October 20, 2005, M. Rose executed and delivered a promissory note in the principal amount of $320,000.00, loan number ending in x5122 in favor of FirstMerit ("FM MRR Note Five").  FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note Five in the property commonly known as 815 West Liberty Street, Medina, Ohio, 44256.

(vii)     On October 20, 2005, M. Rose executed and delivered a promissory note in the principal amount of $4,000,000.00, loan number ending in x5126 in favor of FirstMerit.  The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, referred to herein as the "FM MRR Note Six").

8

FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note Six in the property commonly known as 801, 803, 805 and 807 East Washington Street, Medina, Ohio, 44256.

(viii) On October 20, 2005, WPI executed and delivered a promissory note in the principal amount of $1,200,000.00, loan number ending in x5113 in favor of FirstMerit. The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, referred to herein as the "FM MRR Note Seven"). M. Rose guaranteed the obligations of WPI and MRR under FM MRR Note Seven. FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note Seven in the property commonly known as 21 and 23 South Court Street, Medina, Ohio, 44256.

(ix) On October 20, 2005, Mo-Mi, Ltd. executed and delivered a promissory note in the principal amount of $315,000.00, loan number ending in x5123 in favor of FirstMerit. The promissory note was subsequently amended on July 30, 2010, which added MRR as a co-borrower and co-maker on the note (the original note, collectively with the amendment, referred to herein as the "FM MRR Note Eight"). M. Rose guaranteed the obligations of Mo-Mi, Ltd. and MRR under FM MRR Note Eight. FirstMerit was granted a mortgage and an assignment of rents to secure FM MRR Note Eight in the property commonly known as 277 and 281 South Court Street, Medina, Ohio, 44256.

(x) On January 21, 2016, FirstMerit obtained cognovit judgments in the Court of Common Pleas, Medina County, Ohio, with respect to the indebtedness due under the FM Western Reserve Note and each of the FM MRR Notes.

(xi)     According to the books and records of the Debtors, approximately: (a) $7,438,983.00 (A Portion - $4,687,974, B Portion - $2,751,009) is owed to FirstMerit as of the Petition Date under the FM Western Reserve Note, plus interest, fees and costs; (b) $92,446.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note One, plus interest, fees and costs; (c) $765,976.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Two, plus interest, fees and costs; (d) $81,879.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Three, plus interest, fees and costs; (e) $237,716.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Four, plus interest, fees and costs; (f) $211,303.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Five, plus interest, fees and costs; (g) $2,641,295.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Six, plus interest, fees and costs; (h) $792,389.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Seven, plus interest, fees and costs; and (i) $245,356.00 is owed to FirstMerit as of the Petition Date under the FM MRR Note Eight, plus interest, fees and costs.

(b)     Westfield Bank, F.S.B. ("Westfield")

(i)     On January 15, 2012, MRR, WPI and M. Rose executed and delivered a promissory note in the principal amount of $725,356.25, in favor of Western Reserve Bank, which was subsequently purchased by Westfield ("Westfield Note One"). Westfield was granted a mortgage and an assignment of rents to secure Westfield Note One in the property commonly known as 149 East Liberty Street, Wooster, Ohio 44691.

(ii)     On January 29, 2009, M. Rose executed and delivered a promissory note in the principal amount of $300,000.00, loan number ending in x6372 in

10

favor of Western Reserve Bank, which was subsequently purchased by Westfield ("Westfield Note Two"). Westfield was granted a second mortgage to secure Westfield Note Two in the property commonly known as 23 Public Square, Medina, Ohio, 44256.

(iii) On March 12, 2001, M. Rose executed and delivered a promissory note in the principal amount of $1,080,000.00, in favor of Western Reserve Bank, which was subsequently acquired by Westfield ("Westfield Note Three"). The loan was modified on January 15, 2012 to add MRR and WPI as guarantors of the indebtedness. Western Reserve was granted a mortgage and an assignment of rents to secure Westfield Note Three in the properties commonly known as 43 - 47 Public Square, Medina, Ohio 44256.

(iv) On June 25, 2014, MRR and M. Rose executed and delivered a promissory note in the principal amount of $87,605.00, in favor of Westfield (the "Westfield Note Four"). Westfield was granted a mortgage and an assignment of rents to secure Westfield Note Four in the property commonly known as 241 South Court, Medina, Ohio, 44256.

(v) On June 25, 2014, MRR and M. Rose executed and delivered a promissory note in the principal amount of $1,752,091.00, loan number ending in x6372 in favor of Westfield. The promissory note was subsequently amended on January 27, 2015 (the original note, collectively with the amendment, the "Westfield Note Five"). Westfield was granted a mortgage and an assignment of rents to secure Westfield Note Five in the property commonly known as 740-750 East Washington Street, Medina, Ohio, 44256.

(vi) According to the books and records of the Debtors, approximately: (a) $421,191.00 is owed to Westfield as of the Petition Date under the

Westfield Note One, plus interest, fees and costs; (b) $252,300.00 is owed to Westfield as of the Petition Date under the Westfield Note Two, plus interest, fees and costs; (c) $686,606.00 is owed to Westfield as of the Petition Date under the Westfield Note Three, plus interest, fees and costs; (d) $118,038.00 is owed to Westfield as of the Petition Date under the Westfield Note Four, plus interest, fees and costs; (e) $1,062,346.00 is owed to Westfield as of the Petition Date under the Westfield Note Five, plus interest, fees and costs.

      (c)    <u>Fifth Third Bank ("Fifth Third")</u>

      (i)    On March 8, 2010, M. Rose executed and delivered a promissory note in the principal amount of $1,904,278.91, in favor of Fifth Third (as amended or otherwise modified from time to time, the "Fifth Third Note"). MRR has guaranteed the indebtedness due Fifth Third under the Fifth Third Note. Fifth Third was granted a mortgage and an assignment of rents to secure the Fifth Third Note in the property commonly known as 431-457 West Liberty, Medina, Ohio, 44256. Fifth Third was also granted a second mortgage in the properties commonly known as 18 Public Square, Medina, Ohio 44256 and 801, 803, 805 and 807 East Washington Street, Medina, Ohio, 44256.

      (ii)    On March 7, 2016, Fifth Third obtained a cognovit judgment in the Court of Common Pleas, Medina County, Ohio, with respect to the indebtedness due under the Fifth Third Note.

      (iii)    According to the books and records of the Debtors, approximately $1,399,259.00 is owed to Fifth Third as of the Petition Date under the Fifth Third Note, plus interest, fees and costs;

      (d)    <u>Dollar Bank, Federal Savings Bank ("Dollar")</u>

12

(i) On August 12, 2003, WPI executed and delivered a promissory note in the principal amount of $360,000.00, in favor of Dollar (the "Dollar Note"). M. Rose has guaranteed the indebtedness due Dollar under the Dollar Note. Dollar was granted a mortgage and an assignment of rents to secure the Dollar Note in the property commonly known as 18 Public Square, Medina, Ohio, 44256.

(ii) According to the books and records of the Debtors, approximately $186,336.00 is owed to Dollar as of the Petition Date under the Dollar Note, plus interest, fees and costs.

(e) <u>Northwest Savings Bank ("Northwest Savings")</u>

(i) On December 13, 2006, M. Rose executed and delivered a promissory note in the principal amount of $255,000.00, in favor of Morgan Bank, N.A, which was subsequently purchased by Northwest Savings (the "Northwest Savings Note"). Northwest Savings was granted a mortgage to secure the Northwest Savings Note in the property commonly known as 28 Public Square, Medina, Ohio, 44256.

(ii) According to the books and records of the Debtors, approximately $214,464.00 is owed to Northwest Savings as of the Petition Date under the Northwest Savings Note, plus interest, fees and costs.

**Part II: Events Leading to the Filing of the Present Chapter 11 Cases**

17. Like other real estate companies, the Debtors financial performance is sensitive to a steep market decline in the value of commercial real estate. The value of Debtors' real property holdings has decreased substantially since the market peak in 2007. Since March 2010, the Debtors have been unable to maintain loan-to-value ("LTV") ratios set forth in respective promissory notes or business loan agreements

on certain commercial properties which resulted in the Debtors being determined to be in default by its lenders. This has required Debtors to enter into various forbearance agreements and loan modifications in an attempt to fall in compliance with the terms of the respective promissory notes. In an effort to provide lenders with additional assurances under the notes, the Debtors have sold multiple properties within the past few years to pay down their obligations under the notes to improve LTV ratios. Despite the squeeze in real estate values, Debtors did not default in any of their payments to secured lenders until November 2015.

18.     Since November 2015, the Debtors have been engaged in extensive discussions and negotiations with their secured lenders in an attempt to restructure their existing loans. Ultimately, those negotiations were not successful. Simultaneously, the Debtors attempted for several months to find replacement lenders to provide the Debtors additional liquidity or to refinance the Debtors' existing loans. Certain of those parties entered into direct negotiations with secured lenders to buy out certain promissory notes which would allow Debtors to come within compliance under the terms of the notes. However, the efforts to find a lender that would extend sufficient credit were ultimately not successful.

19.     During the past several months, notwithstanding the Debtors continued efforts to service their debt obligations, two of the secured lenders commenced lawsuits and obtained confessions of judgment against the Debtors. Accordingly, these confessions of judgment and the lack of having a lender willing to extend credit outside of a bankruptcy filing all contributed to the Debtors' need to commence the

14

Chapter 11 Cases.

## Part III: The Chapter 11 Cases

20.     As a result of the foregoing, the Debtors concluded, after evaluating their alternatives and consulting with their advisors and their respective boards of directors, that the Debtors' interests and the interests of their creditors and employees would be best served by attempting to reorganize under the Bankruptcy Code.  The Debtors filed the Chapter 11 Cases to preserve the value of their management company and to maximize the value of their assets for the benefit of all stakeholders.  The Debtors intend to explore options related to the sale or refinancing of their real estate holdings to satisfy the valid and allowed claims of both their secured and unsecured creditors.

## Part IV: Facts in Support of First Day Pleadings[3]

21.     Concurrently with the filing of the Chapter 11 Cases, the Debtors have filed a number of First Day Pleadings, each of which is described briefly below.  I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe that the relief sought in each of the First Day Pleadings: (a) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption; and (b) constitutes a critical element in maintaining the value of the Debtors' assets during the chapter 11 process.

a. Debtors' Motion for an Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Approving Caption for Jointly Administered Cases

22.     The Debtors consist of three separate entities that are related to each other through the ownership and/or management of commercial real estate located in the Ohio counties of Medina and Wayne.  The Debtors operate in an integrated manner that

---

[3] Capitalized terms not defined within this Part IV shall have the meanings ascribed to such terms in the respective First Day Pleadings.

requires the chapter 11 cases to be jointly administered.  Because of this integrated nature of operations, the expense and potential confusion of running separate chapter 11 cases would materially hamper the Debtors' restructuring efforts and drive up administrative costs.

23.     I understand that the Bankruptcy Code and Bankruptcy Rules permit the joint administration of Chapter 11 Cases for procedural purposes where the Debtors are corporate entities and are affiliated through common ownership or management of substantially all of the property of a debtor under a lease or operating agreement.

24.     The Debtors are corporate entities and are affiliated through the consolidated operation of the businesses.  WPI manages the operations of Western Reserve and MRR through a lease or operating agreement.

25.     I am informed by counsel that the joint administration of the Chapter 11 Cases will permit the Clerk of Courts to utilize a single general docket and a specific caption for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in savings to the estates. Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

b. Debtors' Motion for an Order Waiving Compliance with Local Bankruptcy Rules 9013-1(a) and 9013-2(d) in connection with First Day Motions

26.     The Debtors seek a waiver of Local Bankruptcy Rules 9013-1(a) and 9013-2(d) which provide, respectively, that all motions shall be accompanied by a memorandum in support and that all copies of all Unreported Opinions cited by a party be included with the pleading.

16

27.     I am informed by counsel that waiver of Local Bankruptcy Rules 9013-1(a) and 9013-2(d) would promote efficiency by negating the need for duplicative filings and the production of voluminous documents. Accordingly, I believe that the relief requested in the waiver motion is in the best interests of the Debtors and the Court.

c.   Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Employee Obligations and (II) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations.

28.     Western Reserve and MRR have no employees.  As of the petition date WPI employs approximately seven full-time and/or part-time hourly and salaried employees, (collectively, the "Employees").  The Employees are comprised of office and maintenance personnel responsible for the day-to-day management of the commercial real estate owned and/or managed by Debtors.

29.     The Debtors have costs and obligations associated with their Employees that arose prior to the Petition Date. Certain of those obligations are outstanding and due and payable as of the Petition Date and certain will become due and payable in the ordinary course of business after the Petition Date.

30.     The Debtors estimate that, as of the Petition Date, the aggregate amount of outstanding, due and payable Employee Obligations is approximately $14,777.00. This estimate does not include obligations that are not cash pay obligations of the Debtors as of the Petition Date, such as paid vacation.

Paychex, Inc.

31.     The Debtors' utilize the services of Paychex, Inc. ("Paychex") for the administration of their payroll and tax administration.  To facilitate payment of the Employee Obligations (including Wage Obligations and Payroll Taxes (defined below)),

17

the Debtors advance funds from the Banks to Paychex 1-2 business days prior to the Debtors' regularly scheduled payroll (the "Paychex Advance"), then Paychex makes payments to (i) the Employees in connection with the Wage Obligations and (ii) the Taxing Authorities (defined below) in connection with the Payroll Taxes. The Debtors pay Paychex fees of approximately $200.00 per month in connection with their agreement with Debtors. Payment of these modest fees is crucial for the Debtors' seamless entry into chapter 11 and to ensure that there is no disruption in payment of the Wage Obligations or Payroll Taxes.

Wage Obligations

32.     The Debtors typically pay obligations relating to Employee wages, salary and compensation (the "Wage Obligations") on a bi-weekly basis by providing the Paychex Advance to Paychex, and Paychex then either (i) provides direct deposits into the Employees' private bank accounts or (ii) issues checks to the Employees. The Debtors estimate that their gross bi-weekly payroll for the Wage Obligations is approximately $14,777.00. The Debtors' last payroll was made on April 7, 2016, which includes payment of wage obligations through April 2, 2016 (the end of the bi-weekly pay period). The Debtors estimate that as of the Petition Date, they have approximately $14,777.00 in Wage Obligations that are accrued and outstanding. The Debtors next regularly scheduled payroll occurs on April 21, 2016, but the funds will be directed to Paychex on April 20, 2016.

Payroll Taxes

33.     The Debtors, through Paychex, are required by law to withhold amounts related to federal, state and local income taxes, as well as social security and Medicare

18

taxes (collectively, the "Withholding Taxes") from the Wage Obligations and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities"). Debtors are also required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based upon a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and/or federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Debtors include the amounts required by Paychex to pay the Payroll Taxes in the Paychex Advance. The Debtors do not believe that any prepetition Payroll Taxes are due and payable to the Taxing Authorities as of Petition Date.

34. The Debtors, through Paychex, may also withhold certain amounts for various writs of garnishment, such as tax levies or child support.

Employee Benefits

35. The relief sought in the Employee Obligations motion is necessary to ensure that the Debtors' Employees are able to focus on their immediate tasks by providing them with assurances that they will continue to receive their wages, salaries, and benefits is essential to the continued operation of the Debtors. Paying the Wage Obligations will ensure that the Employees will remain committed partners of the business enterprise during the pendency of the chapter 11 cases.

36. Any delay or failure to pay the Wage Obligations would irreparably impair the Employees' morale, dedication, confidence and cooperation, and would adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to the Debtors' success in chapter 11. At this juncture, the

19

Debtors cannot afford the risk of substantial damage to their businesses that would inevitably result from a decline in their Employees' morale, or worse, a decline in their Employee ranks as Employees seek other opportunities they believe will provide better assurances of regular payment of wages, salaries and/or benefits.

37.     Without the requested relief, and in light of the personal consequences to the Debtors' Employees, as noted above, it is a distinct possibility that otherwise loyal and driven Employees will seek more stable employment elsewhere. Additionally, it would be inequitable to require the Debtors' Employees to personally bear the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be timely reimbursed.

38.     With respect to Payroll Taxes, the payment of such taxes will similarly not prejudice other creditors of the Debtors' estates as the relevant Taxing Authorities will generally hold priority claims with respect to the Payroll Taxes.  Moreover, the portion of the Payroll Taxes withheld from an Employee's wages on behalf of the applicable Taxing Authority are held in trust by the Debtors, and thus, are not property of the Debtors' estate.  Additionally, failure to remit Payroll Taxes to a Taxing Authority may give rise to personal liability for the Debtors' officers and directors.

39.     Additionally, it is necessary to continue payment of the Paychex service fees to Paychex as it administers the Debtors' Employee Obligations.    Without the continued use of the service of Paychex, the Debtors will be unable to continue to honor their Employee Obligations in an efficient and cost-effective manner.

40.     The Employee Obligations Motion does not seek to alter Debtors' Employees' compensation, vacation, or other benefits policies at this time.  The motion is

20

intended only (i) to permit the Debtors, in their sole discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) to permit the Debtors, in their discretion, to continue to honor their practices, programs and policies with respect to their Employees, as such practices, programs and policies were in effect as of the Petition Date. Payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors and all parties in interest and will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption.

41.     The Employee Obligations motion further requests that the Court authorize and direct the Banks to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic funds transfers requested or to be requested by the Debtors relating to the Employee Obligations and the Paychex Advance. The motion also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or transfer requests on account of the Employee Obligations and the Paychex Advance dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

d.  Debtors' Motion for Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and (I) Establishing Procedures for Determining Requests for Additional Assurance

42.     In connection with the operation of their business, the Debtors obtain gas, water, sewer, electric, telephone, wireless, and other services (collectively, the Utility

Services") from the Utility Companies for the operation of their main office and certain commercial properties in which they manage. Currently, the Utility Companies provide the Debtors with an aggregate total of approximately $35,782.00 in utility services each month. The Utility Services provided to the Debtors by the Utility Companies are listed on the Exhibit A attached to the motion (the "Utility Services List"). The Debtors estimate that their postpetition use of the Utility Companies' services will be approximately $35,782.00 per month.

43.     The average monthly usage, by Utility Company, is: (a) American Electric Power - $4,981.50; (b) Armstrong Cable - $234.74; (c) Century Link - $266.76; (d) City of Medina - $3,180.55; (e) Columbia Gas - $4,770.21; (f) Dominion – East Ohio - $953.37; (g) Frontier - $318.27; (h) MCTV - $93.63; (i) Medina County Sanitary Engineers - $1,883.52; (j) Ohio Edison - $18,412.83; (k) Republic Waste Services - $73.68; (l) Select Security Services - $55.45; and (m) Wooster City Services - $557.19.

44.     As of the Petition Date, the Debtors are current in their payments to all Utility Companies currently providing Utility Services to the Debtors. Currently, there are no deposits being held by the Utility Companies.

45.     Uninterrupted Utility Services are critical to the Debtors' ability to reorganize and revive their operations during the pendency of these Chapter 11 cases. Any interruption in the Utility Services, however slight, would jeopardize not only the restructuring efforts of the Debtors, but also the Debtors' ability to operate their business and maintain services on behalf of lessees in the commercial properties in which they manage. By the Utilities Motion, the Debtors seek interim and final orders (the "Interim Order" and "Final Order," respectively): (i) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services to, or discriminating against,

the Debtors on account of amounts outstanding prior to the Petition Date or any perceived inadequacy of the Debtors' proposed adequate assurance; (ii) determining that the Utility Companies, including but not limited to, those listed on the Utility Services List, have been provided with adequate assurance of payment within the meaning of § 366 of the Bankruptcy Code; (iii) approving the Debtors' proposed procedures for determining requests for additional adequate assurance of payment to Utility Companies for future utility services.

The Proposed Adequate Assurance

46.     The Debtors fully intend to pay all post-petition obligations owed to the Utility Companies in a timely manner as the Debtors expect to have sufficient cash to pay all post-petition obligations for Utility Services.

47.     However, as adequate assurance is required by the Bankruptcy Code, the Debtors propose to provide a deposit equal to two weeks of the average seasonal cost of Utility Service to any Utility Company, so long as such Utility Company is not the beneficiary of an escrow or other security arrangement or that such Utility Company is not currently paid in advance for its services (an "Adequate Assurance Deposit").

48.     As a condition of accepting an Adequate Assurance Deposit, the Requesting Utility shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of future payment to such Utility Company within the meaning of section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of the Debtors' chapter 11 cases. Upon the effective date of any plan of reorganization or upon the closing of a sale of substantially all of the Debtors' assets, with regard to any Utility

23

Company that receives an Adequate Assurance Deposit, the Debtors request that they be entitled to: (i) in the case of a confirmed plan, have that deposit credited to any amounts owed to such Utility Company as of that date or in the future; or (ii) in the case of a sale, receive the return of such Adequate Assurance Deposit upon the cessation of such Utility Company's services to the Debtors post-closing.

49. The Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes that additional assurance is required, it may request such additional assurance pursuant to the following procedures.

<u>Adequate Assurance Procedures</u>

50. If, however, a Utility Company is not satisfied with the Proposed Adequate Assurance, the Debtors propose the following procedures for seeking additional assurance (the "Additional Adequate Assurance Procedures"):

(a) If a Utility Company does not believe that the Proposed Adequate Assurance is sufficient (the "Objecting Utility"), it shall contact the Debtors in writing to attempt to resolve its request but shall have 14 days from entry of the Interim Order to file a notice with the Court requesting a hearing on additional adequate assurance.

(b) If a Utility Company requires additional adequate assurance, it must serve the request on: (i) the Debtors, 23 South Court, Medina, OH 44256 (Attn: Michael Rose); and (ii) counsel to the Debtors, Roderick Linton Belfance, LLP, 50 South Main Street, 10th Floor, Akron, OH 44308 (Attn: Kathryn A. Belfance and Steven J. Heimberger).

(c) If the Debtors and the Objecting Utility do not come to an agreement on additional adequate assurance, the Court shall hold a hearing to determine whether the Objecting Utility is entitled to additional adequate assurance.

24

(d)     In the event that no Objecting Utility files a notice seeking additional adequate assurance within 14 days from entry of the Interim Order, then the Interim Order shall become the Final Order without the need for a further hearing.

**e. Debtors' Motion for an Order (A) Authorizing Debtors to (I) Utilize Cash Collateral on an Interim and Final Basis Pursuant to 11 U.S.C. 363 and (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ Scheduling A Final Hearing Pursuant to Bankruptcy Rule 4001**

51.     At the time of obtaining debt financing from the Cash Collateral Creditors, the Debtors executed an assignment of rents in connection with each of the commercial loans.

52.     Debtors believe the fair market value of each parcel of real estate owned by Debtors exceeds the amount due under the first position loan from Cash Collateral Creditor in all but two instances:

a.     On October 18, 2005, Western Reserve executed and delivered a promissory note in the principal amount of $9,280,000.00, loan number ending in x5110 in favor of FirstMerit.  The promissory note was subsequently amended on March 15, 2014, and bifurcated the note into two portions: (a) an A Portion in the principal amount of $4,825,000, and (b) a B Portion in the principal amount of $2,751,008.94.  The bifurcated notes were further amended on November 8, 2015 (the original note, collectively with the amendments, referred to herein as the "FM Western Reserve Note").  M. Rose, WPI and MRR have each guaranteed the indebtedness due FirstMerit under the FM Western Reserve Note.  FirstMerit was granted a mortgage and an assignment of rents to secure FM Western Reserve Note in the property commonly known as 3985, 3995, and 4015 Medina Road, Medina, Ohio, 44256.  Debtors believe the fair market value of the property to be $6,380,000.00.  According to the books and records of the Debtors, approximately

$7,438,983.00 is owed to FirstMerit as of the Petition Date under the FM Western Reserve Note, plus interest, fees and costs.

       b.     On March 8, 2010, M. Rose executed and delivered a promissory note in the principal amount of $1,904,278.91, in favor of Fifth Third (as amended or otherwise modified from time to time, the "Fifth Third Note"). MRR has guaranteed the indebtedness due Fifth Third under the Fifth Third Note. Fifth Third was granted a mortgage and an assignment of rents to secure the Fifth Third Note in the property commonly known as 431-457 West Liberty, Medina, Ohio, 44256. Fifth Third was also granted a second mortgage in the properties commonly known as 18 Public Square, Medina, Ohio 44256 and 801, 803, 805 and 807 East Washington Street, Medina, Ohio, 44256. Debtors believe sufficient equity exists in the additional collateral granted to Fifth Third such that the value of Fifth Third's collateral exceeds the amount due under the Fifth Third Note.

53.     The use of the Cash Collateral is essential to permit the Debtors to operate and to develop their plan of reorganization. In short, the Debtors are unable to operate without the use of Cash Collateral and the entry of an Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' operations, its creditors and other parties in interest.

54.     To preserve the value of the Debtors' assets, the Debtors require the interim use of Cash Collateral and without such use, the value of the Debtors' assets will immediately and substantially diminish and the Debtors would be forced to cease operations.

55.     Access to the Cash Collateral will provide the Debtors' customers, vendors and employees with the requisite security that the Debtors will be able to

continue to conduct business in the ordinary course and without interruption. Otherwise, the Debtors would be forced to shut down operations which would cause irreparable harm to the Debtors' reorganization prospects.

56. Permitting the Debtors to utilize Cash Collateral will have the dual effect of protecting the value of the Cash Collateral Creditors' collateral, as well as providing the Debtors with the funds necessary to begin the administration of their chapter 11 cases.

57. As part of the adequate protection for any diminution in the value of the Cash Collateral Creditor's interest in the pre-petition collateral, the Debtors propose to grant to the Cash Collateral Creditor a replacement lien consisting of a lien upon all property of the Debtors of the same type and description as the pre-petition collateral to the extent the Cash Collateral Creditor holds a valid, properly perfected lien on such collateral as of the Petition Date (the "Replacement Liens"). With the exception of the FM Western Reserve Note, Debtors shall make monthly interest payments commencing May 15, 2016 at the applicable non-default rate (varying between 3.75-6.95%) per annum in the amounts set forth in the Interim Budget. With respect to the FM Western Reserve Note, Debtors shall make monthly interest payments commencing July 15, 2016 at the applicable non-default rate of 5.0% per annum in the amount set forth in the Interim Budget (together, the "Adequate Protection Payments"). As further adequate protection, the Debtors shall continue to account for all cash use, and the proposed cash use is being incurred to preserve property of the Estate.

58. In the instant case, the lien on the postpetition rents will result in a "replacement" of the prepetition collateral (the cash resulting from the collection and consumption of prepetition rents) with new, postpetition collateral. The Debtors will be

27

utilizing the postpetition rents to maintain the Cash Collateral Creditors and make the required monthly interest payments.  The net result will be that, save the FM Western Reserve Note, the Cash Collateral Creditors will receive the contract rate of interest  due under the prepetition loan agreements and the properties will be maintained in at least there present condition, and as a result will experience little or no diminution in the value of their collateral pool.  With respect to the FM Western Reserve Note Portion A, the Debtors have proposed to make adequate protection payments to FirstMerit based upon the applicable non-default interest rates of 5%.  Additionally, Debtors continue to lease available space at the Western Reserve location which will not only maintain the value of the collateral, but will increase the value of FirstMerit's collateral.  The interest payments, together with the leasing of additional space (and subsequent increase in rents), will result in FirstMerit's collateral experiencing little to no diminution in value.

f.  Debtors' Emergency Motion for an Order Scheduling Expedited Hearing to Consider the First Day Pleadings and Approving Note Thereof

59.  The First Day Pleadings described above involve matters that require an emergency and expedited hearing, and the Debtors are requesting that the Court, on an *ex parte* basis, schedule the First Day Hearing as soon as the Court's schedule will permit and that the Court approve the form of notice thereof.

60.  The relief requested in the motion is necessary to obtain expedited relief on the First Day Pleadings.  As described in detail in each of the First Day Pleadings, the expedited relief requested in the First Day Pleadings is essential to: (a) obtain financing; (b) ensure a smooth transition into chapter 11; (c) maintain the Debtors' operations and businesses throughout the Chapter 11 Cases; (d) efficiently administer the bankruptcy cases; and (e) establish the basis for the Debtors' restructuring efforts.  The emergency

28

motion and the First Day Pleadings are of the type typically heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' operations and their transition into operating as chapter 11 debtors in possession.

61.    Pending entry of an order approving the Emergency Hearing Motion, the Debtors propose to serve the "Notice of Expedited Hearing on First Day Motions" (the "Notice") is attached to the Expedited Hearing Motion as Exhibit A as soon as possible on April 18, 2016, via e-mail, overnight delivery or facsimile transmission to (i) the United States Trustee for the Northern District of Ohio; (ii) those creditors listed on the Debtors' Consolidated List of Creditors Holding 20 Largest Unsecured Claims as identified in their chapter 11 petitions; (iii) the Debtors' secured lenders under their prepetition financing facilities or their counsel;; and (iv) each party whose rights are affected by such First Day Pleading, as such parties are listed in the "Notice" paragraph of the applicable First Day Pleading (collectively, the "Notice Parties"). The Notice will inform the Notice Parties of the hearing date and time, provide them with a list of the First Day Pleadings, and tell them how they may obtain copies of the First Day Pleadings.

62.    For all of the reasons stated herein, I believe that the approval of the First Day Pleadings is in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief. Further affiant sayeth naught.

_____
Michael R. Rose, President & Chief Executive Officer